UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

KYLE TAYLOR KIDWELL,

           Plaintiff,

v.                                         Case No. 6:16-cv-2043-Orl-37GJK

ACTING COMMISSIONER OF SOCIAL
SECURITY, NANCY A. BERRYHILL,

           Defendant.

---

## ORDER

This cause is before the Court on the following matters: (1) Transcript of Administrative Proceedings (Doc. 10);[1] (2) Joint Memorandum (Doc. 14); (2) U.S. Magistrate Judge Gregory J. Kelly's Report and Recommendation (Doc. 18); (3) Commissioner's Objections to Report and Recommendation (Doc. 19); (4) Plaintiff's Partial Objections to the Magistrate Judge's Report and Recommendation (Doc. 20); and (5) Plaintiff's Response to Defendant's Objections to the Magistrate Judge's Report and Recommendation (Doc. 21).

### BACKGROUND

On August 12, 2010 ("**Application Date**"), Plaintiff Kyle Taylor Kidwell ("**Kidwell**") filed an application with the Social Security Administration ("**SSA**"), claiming entitlement to Supplemental Security Income ("**SSI**") benefits based on

---

[1] Citations to the Transcript are to the docket number and transcript page number noted in the bottom right corner of each page: (Doc. ##, pp. ##).

disability ("**Disability Claim**").[2] On the Application Date, Kidwell was twenty years old and had graduated from high school after receiving special educational services throughout his academic career. In childhood, Kidwell was diagnosed with several mental and physical ailments, including: attention deficit hyperactivity disorder ("**ADHD**"), bipolar disorder, learning disability, and anxiety ("**Mental Ailments**"); and obstructive sleep apnea ("**OSA**"), obesity, and asthma ("**Physical Ailments**"). He was prescribed many medications, including: Abilify, Topamax, Focalin, Seroquel, Maxair, and Topamax.

On the Application Date, Kidwell had no driver's license, no income, and no employment experience of any kind. He resided with his mother Cathy Kidwell ("**C.K.**"), his father, and his siblings. Kidwell's father helped him with shopping, certain household chores, and assisting his grandmother. C.K. cooked many of Kidwell's meals, helped him remember his medications, and regularly accompanied him to obtain assessment and care from numerous physicians and mental health care providers—including long-time family physician Joan Kidd, M.D. ("**Dr. Kidd**").

With her colleagues at Physician Associates of Florida ("**PAF Practice**"), Dr. Kidd provided health care to Kidwell, managed many of his medications, and referred him to specialists who often then provided Dr. Kidd with documents concerning their diagnosis

---

[2] (*See* Doc. 10-8, pp. 464–70.) The Court has exhaustively reviewed the voluminous record, which the parties helpfully summarized in their Joint Memorandum. (*See* Doc. 14, pp. 4–21; *see also* Doc. 10-1.) In the interest of efficiency, this Order largely provides citations only to the specific record evidence necessary to resolve the issues raised in the parties' respective objections to the Report and Recommendation ("**Report**") issued by U.S. Magistrate Judge Gregory J. Kelly ("**Judge Kelly**"). (Docs. 18–21.)

and attempts to treat Kidwell for his Mental and Physical Ailments and newer problems, including: psychogenic non-epileptic seizures ("**Seizure Disorder**"), migraines, heart palpitations, syncope, dizziness and fainting, sleep disturbance, gastrointestinal problems ("**GI**"), and a broken wrist ("**Wrist Injury**").[3]

Although three hearings have been conducted before two different Administrative Law Judges ("**ALJ**"), and multiple decisions have issued from the Commissioner of Social Security ("**Commissioner**") and the Florida Department of Health ("**State Agency**"), Kidwell's Disability Claim remains unresolved. Unfortunately, this uncertainty concerning entitlement to SSI benefits must continue because—as explained below—in issuing his most recent unfavorable decision on the Disability Claim ("**2015 Decision**")—ALJ Robert Marcinkowski ("**ALJ Marcinkowski**") committed reversible error by failing to provide the structured and detailed analysis required when treating physician opinion evidence is devalued and discredited, and by departing from uniform rules and procedures established for the adjudication of all SSI claims.[4]

---

[3](*See* Doc. 10-12, pp. 719–37, 772–85; Doc. 10-13, pp. 878–89; Doc. 10-14, pp. 914–25, 963–82; Doc. 10–15, pp. 1018–26; Doc. 10-18, pp. 1190–1265; Doc. 10-19, pp. 1276–84, 1301–32; Doc. 10-20, pp. 1350–65, 1425–28; Doc. 10-22, pp. 1533–42; Doc. 10-24, pp. 1615–86; *see also* Doc. 14.)

[4] By this opinion, the Court intimates no view as to the actual merits of Kidwell's Disability Claim. "Rather, this opinion speaks only to the process the ALJ must engage in and the findings and analysis the ALJ must make." *See Phillips v, Barnhart*, 357 F.3d 1232, 1244 (11th Cir. 2004) (vacating district court's order and remanding to the SSA for reconsideration of disability claim and issuance of a decision that reflects adherence to established analytical procedures); *Sharfarz v. Bowen*, 825 F.2d 278, 280–81 (11th Cir 1987) (same).

## THE SOCIAL SECURITY ACT

The SSI program—which is established under the Social Security Act ("**Act**") and is administered by the Administration—exists to "assure a minimum level of income for people who are . . . disabled and who do not have sufficient income and resources to maintain a standard of living at the established Federal minimum income level." *See* 20 C.F.R. §§ 416.105, 416.110; *see also* 42 U.S.C. § 1383(a)(1). To obtain such income ("**SSI Benefits**"), a person who meets "all the requirements for eligibility" and believes they are disabled ("**Claimant**"), may claim SSI benefits by filing an application with the Commissioner ("**Claim**"). *See* 20 C.F.R. § 416.305. Claims must then be resolved in accordance with uniform legal standards, including procedures and rules established in federal regulations promulgated by the Commissioner.[5] *See* 42 U.S.C. § 421(k) (directing the Commissioner to establish "uniform standards" for disability determination, review, and adjudication); 20 C.F.R. § 416.901 (summarizing controlling procedural requirements).

The Claimant is required—at all levels of the review process—to prove his disability by a preponderance of the evidence. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (discussing burden of proof). On behalf of the Commissioner, the ALJ is required

---

[5] When the Commissioner grants a claim in a final decision, he must pay SSI benefits to the Claimant. *See* 42 U.S.C. §§ 1381a, 1383(a)(1); 20 C.F.R. § 416.330(a) (requiring that the Commissioner pay benefits in the "month following the month" that the Claimant first meets all the eligibility requirements); *id.* § 416.501 (requiring payment of benefits in "each subsequent month provided" that all eligibility and payment requirements are met).

to: (1) develop a full and fair record;[6] (2) consider all of the record evidence; (3) decide whether the Claimant is disabled in accordance with a five-step sequential analysis ("**Sequential Analysis**"); and (4) provide explicit reasoning in its decision—by stating with "sufficient clarity the legal rules being applied and the weight accorded the evidence considered" ("**Explicit Reasoning Requirement**"). *See Ryan v. Heckler*, 762 F.2d 939 (11th Cir. 1985); *see also Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011); *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986) (stating that the ALJ "must state specifically the weight accorded each item of evidence and the reasons for his decision"). In addition, ALJs must reach a decision on remand "in strict compliance" with the remand order issued by the Appeals Council of the SSA's Office of Hearings and Appeals ("**Council**"). *See Apone v. Comm'r of Soc. Sec.*, 435 F. App'x 864, 865 (11th Cir. 2011) (addressing claim that ALJ's decision did not comply with remand order).

### INITIAL ADMINISTRATIVE DECISIONS

In response to the Disability Claim, the State Agency issued unfavorable decisions on November 23, 2010, January 3, 2011, January 4, 2011, and April 18, 2011 ("**State Decisions**"). (*See* Doc. 10-4, pp. 184–202; Doc. 10-9, pp. 540–52.) In accord with the State Decisions, the Administration denied the Disability Claim initially and on reconsideration (**2011 Decisions**"). (*See* Doc 10-5, pp. 266–71, 275.) Contending that he is

---

[6] *See* 20 C.F.R. § 416.203(a) (providing that the Commissioner will help the Claimant "get any documents" that he needs but does not have); *see also* 42 U.S.C. § 423(5)(B) (requiring that the Commissioner "develop a complete medical history" and make every reasonable effort to obtain medical evidence from the Claimant's treating provider "prior to evaluating medical evidence" from a consultative source).

unable to work due to "multiple health conditions, including heart abnormalities, intestinal problems, mood disorders, and blackouts/seizures," Kidwell then requested a hearing before an ALJ. (*Id*. at 276.)

On September 28, 2012, ALJ Robert D. Tutera ("**ALJ Tutera**") conducted the first hearing on Kidwell's Disability Claim ("**2012 Hearing**"). (Doc. 10-3, pp. 166–82.) With legal representation, Kidwell appeared at the 2012 Hearing via video teleconference. (*See id*. at 166; *see also* Doc. 10-5, p. 279.) Kidwell—who was morbidly obese—testified that he suffered from bipolar disorder, anxiety, anger, depression, seizures, extreme migraines, colon issues, low potassium and testosterone levels, leg cramps, pain in his left wrist, and asthma. (*See* Doc. 10-3, pp. 171–81.) Kidwell further testified that he was receiving medical treatment for these problems from Dr. Kidd, neurologist Ahmed H. Sadek, M.D. ("**Dr. Sedak**"), and gastroenterologist Steven Feiner, DO ("**Dr. Feiner**"). (*See id*.)

In decision dated January 11, 2013, ALJ Tutera concluded that Kidwell "has not been under a disability . . . since August 12, 2010" ("**2013 Decision**"). Granting Kidwell's request for review of the 2013 Decision, on May 30, 2014, the Council issued an Order ("**2014 Order**") that criticized the 2013 Decision as "unclear" and incomplete. (*See* Doc. 10-4, pp. 226–28.) The 2014 Order directed the ALJ to remedy his errors on remand by: (1) offering Kidwell an "opportunity for a hearing" and further developing the record; (2) considering nonmedical evidence provided by C.K. and Kidwell's aunt Angelina Majewski (Doc. 10-9, pp. 522–29, 563–70); (3) obtaining any necessary "evidence from a vocational expert" ("**VE**"); and (4) issuing a new decision setting out the ALJ's rationale with "specific references to evidence of record." (Doc. 10-4, pp. 227–28.)

On remand, ALJ Marcinkowski conducted a hearing on October 2, 2014 ("**2014 Hearing**"). (*See* Doc. 10-3, pp. 127–62.) With new legal representation, Kidwell appeared in person at the 2014 Hearing, and—in accord with Dr. Sadek's statements concerning the onset of Kidwell's Seizure Disorder[7]—Kidwell amended his disability onset date to October 16, 2009 ("**2009 Onset Date**").[8] (*See* Doc. 10-3, pp. 131, 133, 162; Doc. 10-6, pp. 400–01.)

As documented throughout the Record, Kidwell sought medical treatment for a "major" seizure on the 2009 Onset Date, which caused him to experience dizziness, vision loss, and prolonged unconsciousness, followed by several days of memory loss, left-sided numbness, cramping, and weakness. (*See* Doc. 10-3, p. 133.) For about four years after the 2009 Onset Date ("**Initial Seizure Period**"), Kidwell testified that he sporadically experienced similar major seizures and regularly experienced less severe seizures about four times each month. (*See id.* at 134–35, 137.) The Initial Seizure Period ended on December 6, 2013, when Kidwell underwent surgery to implant a pacemaker in his chest ("**PM Surgery**").[9] (*See id.* at 137–41; Doc. 10-20, pp. 1350–65 (providing records from

---

[7] (*See* Doc. 10-17, pp. 1165–70 ("**Sadek Questionnaire**").)

[8] Although still obese at the 2014 Hearing, Kidwell testified that he had lost more than 100 pounds since the 2013 Hearing. (*See* Doc. 10-3, pp. 129–30.)

[9] Kidwell's cardiologist Ahmad Kamme, M.D. ("**Dr. Kamme**"), stated that the PM Surgery was precipitated by long episodes of "recurrent high grade AV block" ("**Cardiac Episodes**"), which were identified when Dr. Kamme directed Kidwell to wear a Cardiac Tele monitor device for thirty days. (*See* Doc. 10-17, p. 1188 (statement of Dr. Kamme dated July 28, 2014 ("**Kamme Statement**").) According to the Kamme Statement, the syncope episodes—which Kidwell described as a "feeling of slowing of his heart rate," loss of consciousness for two to three minutes, followed by disorientation and left-sided numbness—were "attributed to" OSA. (*See id.*; *see also id.* at 1173–81 (treatment records from Advanced Cardiac Care ("**Kamme Records**"); *id.* at 1182–87 (Dr. Kamme's

Florida Hospital East concerning the PM Surgery).) Kidwell's major seizures ceased after the PM Surgery, but he continued to complain of having about two minor seizures each month—mainly while sleeping. (*See* Doc. 10-3, pp. 135, 140–41.)

In addition to seizures, Kidwell testified that each month he experiences four or five migraines that last about five hours each and cause him "agonizing pain." (*See* Doc. 10-3, pp. 136–137, 142.) Kidwell testified that the migraines leave him dizzy, confused, tired, weak, emotional, and aggressive, and his "migraine hangovers" last for two days after he suffers a migraine. (*See id.* at 137.) In response to questions about his OSA diagnosis and use of a CPAP machine,[10] Kidwell testified that he could not use the CPAP because it made him "choke." (*See id.* at 145.) Instead, Kidwell uses an oral appliance ("**Mouth Guard**"), which opens his jaw so he "can breathe." (*See id.*) Nonetheless, he sleeps poorly and take naps during the day. (*See id.* at 145–46.)

In response to his attorney's questions concerning Mental Ailments—particularly Kidwell's "low" IQ and learning disorder—Kidwell testified that: (1) he has problems with memory and understanding; (2) he "had a lot of trouble" in school; (3) he must be shown a new task "multiple times;" and (4) he forgets things unless he has written them down, repeated them out loud seven times, and then reviewed his notes every couple weeks.[11] (*See id.* at 142–43.) With respect to his bipolar condition and ADHD, Kidwell

---

Cardiac Impairment Questionnaire dated July 1, 2014 ("**Kamme Questionnaire**")).)

    [10] (*See* Doc. 14, p. 5, n.16 (explaining CPAP treatment).)

    [11] At the State Agency's request, Kidwell underwent general intellectual and clinical evaluations in October 2010. (*See* Doc. 10-12, p. 786; *see also* Doc. 10-9, pp. 514–17, 530.) Licensed Psychologist M. Joanna Vilar, Psy.D. ("**Dr. Vilar**") examined Kidwell and administered certain tests—including the Weschler Adult Intelligence Scale-Fourth

testified that: (1) has never been good with authority; (2) he is easily aggravated, frustrated, and angered; (3) he is troubled by "too much noise;" (4) he frequently experiences episodes of stress that he "can't handle," so he walks away or yells; and (5) the isolates himself in his room "[a] lot." (*See id*. at 143–45, 149.)

With respect to the Wrist Injury, Kidwell—who is left-handed—testified that he broke his left wrist in a car accident in 2010. (*See id*. at 146–48.) The break required surgical fixation of the bones with a metal plate and screws ("**Wrist Plate**"). Since the surgery, Kidwell has complained of discomfort, pain, cramping, and decreased his ability to type,

---

Edition ("**WAIS-IV**"). (*See* Doc. 10-12, pp. 787–792 ("**Vilar Report**").) Results of the WAIS-IV indicated that "processing speed and working memory are areas of weakness" for Kidwell, who achieved the following scores:

| Domains | IQ Score | Classification |
|---|---|---|
| Verbal Comprehension | 93 | Average |
| Perceptual Reasoning | 86 | Low Average |
| Working Memory | 69 | Extremely Low |
| Processing Speed | 71 | Borderline |
| Full-Scale | 77 | Borderline |

(*Id*. at 791–92.) Opining that Kidwell's Full-Scale IQ score of 77 "was adversely affected by significant weaknesses in processing speed and working memory, both of which are associated with attention deficits," Dr. Vilar nonetheless diagnosed Kidwell with ADHD, "Predominantly Inattentive Type, *In Partial Remission*." (*See id*. at 792 (emphasis added).) Dr. Vilar also diagnosed Kidwell with: (1) a "Learning Disorder NOS, By History;" (2) "Mood Disorder NOS;" (3) obesity, sleep apnea, hypertension, and asthma; and (4) "limited social skills." (*Id*. at 792.) Although "somewhat controlled with medication," Dr. Vilar noted that Kidwell's "current symptoms" included: difficulties with focus, organization, and maintaining attention; excessive talking; distractibility; and avoidance of "tasks that require sustained mental effort." (*See id*. at 787.) Concluding that his "prognosis is fair," Dr. Vilar recommended that Kidwell: (1) "should continue with medication as indicated by his treatment provider;" (2) "would benefit from individual therapy to learn improved coping skills and mood regulation;" and (3) "would benefit from a referral to a nutritionist to aid in a weight-loss program." (*Id*. at 792.)

write, play video games, pick things up, and lift or hold items that weigh more than eight pounds ("Wrist Problems"). (*See id.* at 147–49.)

After asking Kidwell a handful of questions concerning his daily activities, ALJ Marcinkowski called VE Lee Pike ("**VE Pike**"), and elicited testimony concerning jobs that were available in the national economy under four hypothetical scenarios. (*See id.* at 150–57.) Under the most restrictive hypothetical, VE Pike identified several available jobs, including title order clerk and pari-mutuel ticket checker ("**2014 Jobs**"). (*See id.* at 155–56.) Responding to questions from Kidwell's counsel, VE Pike further testified that: (1) Kidwell could not meet the "competitive standards" of the 2014 Jobs if he consistently committed two or three errors each week or was absent more than three times a month; and (2) competitive work settings would not tolerate "disruptive behavior" or provide the ongoing supervision and extensive instructions that Kidwell testified he needs to remember information and learn new skills. (*See id.* at 157–62.)

In an unfavorable decision dated December 30, 2014 ("**2014 Decision**"), ALJ Marcinkowski concluded that Kidwell had "not been under a disability . . . since August 12, 2010." (Doc. 10-4, pp. 233, 247.) This conclusion was based on findings that: (1) Kidwell's obesity, Seizure Disorder, and mood disorder are severe—but not debilitating—impairments ("**2014 Impairments**"); and (2) Kidwell could do the 2014 Jobs, which—subject to certain limitations—require the residual functional capacity ("**RFC**") to perform sedentary work and simple routine tasks ("**2014 RFC**").[12] (*See id.* at

---

[12] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.

245–47.)

On June 4, 2015, the Council granted Kidwell's request for review of the 2014 Decision ("**Remand Order**"). (*See id.* at 261–64; Doc. 10-6, pp. 403–04.) The Council determined that the 2014 Decision lacked clarity "regarding the nature and severity" of Kidwell's "seizures vs. syncope episodes" and provided inadequate analysis of: (1) the "third party report" submitted by Kidwell's dentist Murad K. Thakur, BDS ("**Dr. Thakur**"); (2) the substantial evidence that contradicted ALJ Marcinkowski's finding that Kidwell's migraines were not severe impairments; (3) the cardiac and non-convulsive epilepsy Listings; and (4) the issue of whether Kidwell's colitis is a severe or non-severe impairment given Dr. Feiner's Medical Source Statement from August 2014 ("**Feiner Statement**"). (*See* Doc. 10-4, pp. 261–63.)

The Remand Order directed that the Claim "*be assigned to another*" ALJ on remand,[13] who must, among other things: (1) obtain "evidence from a medical expert to clarify the nature and severity" of Kidwell's impairments—particularly his headaches, seizures/syncope episodes, and colitis; (2) reconsider the Disability Claim in accordance

---

Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

[13] The Disability Claim was *not* assigned to a different ALJ on remand as ordered by the Council. Instead, ALJ Marcinkowski continued to adjudicate the Disability Claim, indicating that the Council "asked *me* to take another look." (*See* Doc. 10-3, p. 90.) Although disregard of the Council's instructions on remand is legal error subject to judicial review, *Apone*, 435 F. App'x at 865, Kidwell did not explicitly raise the issue in this action or during the remand proceedings. Accordingly, Court does not resolve this action based on the remand error.

with specific regulations and rules; and (3) issue a "new decision" that includes "specific references to evidence of record" in support of the ALJ's evaluation of "treating source opinion" evidence and his rationale for "assessed limitations." (*See id*. at 263–264 (emphasis added).)

REMAND PROCEEDINGS

On September 29, 2015, ALJ Marcinkowski held another hearing ("**2015 Hearing**"), which was attended by Kidwell, his attorney, VE Jane Bouker ("**VE Bouker**"), and "hearing monitor" Billy Brown. (*See id*. at 90–91.) Initially, Kidwell's attorney elicited testimony from Kidwell that his GI caused him "sharp" pain on his lower right side, bleeding in his stool, diarrhea, and—depending on his diet—eight to ten lengthy trips to the bathroom each day. (*See id*. at 94–96, 115.) Kidwell testified that if he is not careful with his diet, he will experience colitis "attacks" that mimic the stomach flu. (*See id*.) When such attacks occur, Kidwell usually "knocks [himself] out" by taking Phenergan. (*See id*. at 103.)

Kidwell's attorney also asked about headaches: they occur three or four times a month and last two to three hours each, but they make Kidwell feel sick all day. (*See id*. at 98.) Kidwell testified that his migraines were more frequent before a change to his Topamax prescription. (*See id*. at 99.) Kidwell also testified that: his seizures have been under control since his PM Surgery; his asthma medication remains effective; and a new prescription for Metroprolol reduced his "episodes of ventricular arrhythmia." (*See id*. at 99–101, 106.)

Kidwell provided rambling testimony about ongoing problems related to his Mental Ailments, including: concentration difficulties, frustration, anger, and Abilify-related weight gain. (*See id*. at 104–06, 115.) Kidwell also continues to suffers from OSA, "most nights" he wakes up "in a sweat" with his heart racing, and he gets only three or four hours of sleep each night. (*See id*. at 102–03.) Kidwell testified that he still gets dizzy daily, and he attributes this problem in part to Vagus Nerve Disorder, low potassium, and bending "up and down." (*See id*. at 99–101, 110–12, 115.) Advising that Wrist Problems persist, Kidwell testified that he now can lift about fourteen pounds, but the Wrist Plate causes his wrist to "lock" in place until he "pushes" the Wrist Plate with the thumb on his other hand. (*See id*. at 107–11.)

As he did during the 2014 Hearing, ALJ Marcinkowski spent very little time asking Kidwell questions. (*See id*. at 116–18.) Instead, he elicited VE Bouker's opinions concerning work that may exist in the national economy under three hypothetical scenarios. (*See id*. at 119–21.) Under the most restrictive hypothetical scenario, VE Bouker identified several available jobs, including electrode cleaner, final assembler, and lens inserter ("**2015 Jobs**").[14] (*See id*. at 121.) Responding to questions from Kidwell's counsel, VE Bouker conceded that the 2015 Jobs could not be done by an individual who: (1) during the initial thirty-day training period, required "frequent" work performance corrections from his supervisor; (2) in addition to normal breaks and lunches, required

---

[14] ALJ Marcinkowski also asked VE Bouker about "any conflicts" between the "occupation evidence" and the publications identified by the Council in its remand instructions. (*See* Doc. 10-3, pp. 121–22; Doc. 10-4, p. 264.)

ten minutes "per hour to go to the bathroom; or (2) experienced more than two absences from work each month. (*See id*. at 122–23.)

On November 9, 2015, ALJ Marcinkowski again rejected Kidwell's Disability Claim. (*See* Doc. 10-2, pp. 40–73.) Summarizing ALJ Marcinkowski's findings of fact and conclusions of law, the 2015 Decision provides:

1. The claimant has not engaged in substantial gainful activity since August 12, 2010, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: colitis; an affective disorder; an anxiety disorder; attention deficient hyperactivity disorder ("ADHD"); and, obesity (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except, the claimant can: occasionally climb, crouch, balance, crawl, stoop, kneel, but never climb ladders, ropes, and scaffolds. He must avoid concentrated exposure to noise, fumes, odors, and dusts, and he must avoid moderate exposure to hazardous machinery and heights. He can understand, remember, and carry out simple instructions and can perform simple routine tasks. He can only have occasional interaction with co-workers, the public, and supervisors.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on December 15, 1989, and was 20 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

**10. The claimant has not been under a disability, as defined in the Social Security Act, since August 12, 2010, the date the application was filed (20 CFR 416.920(g)).**

<u>DECISION</u>

Based on the application for supplemental security income protectively filed on August 12, 2010, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(*Id.* at 73.) In an order dated September 21, 2016 ("**2016 Order**"), the Council rejected Kidwell's request for review of the 2015 Decision.[15] (*See id.* at 2-7.) Alleging that the Final Decision "is not supported by substantial evidence" and is contrary to law, Kidwell filed this action against the acting Commissioner seeking relief under Section 405(g) of the Act ("**405(g) Review**").[16] (*See* Doc. 1, ¶¶1, 3, 4–5, 21–22.)

## 405(g) REVIEW

On 405(g) Review, courts need not defer to the Commissioner's conclusions of law.[17] *See Parks v. Comm'r, Soc. Sec.*, 783 F.3d 847, 850 (11th Cir. 2015) (reviewing legal conclusions de novo). Not so for findings of fact:

> **The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.**

---

[15] An ALJ's decision is a final decision for purposes of 405(g) Review once the Appeals Council denies a claimant's request for review of such decision. *See id.*; *see also Nichols v. Comm'r, Soc. Sec. Admin.*, 679 F. App'x 792, 795 (11th Cir. 2017).

[16] In his Complaint, Kidwell requests that the Court "modify" the Final Decision by granting him SSI benefits for a period of disability that commenced on 2009 Onset Date and continues today. (*See* Doc. 1, ¶¶1, 3, 4–5, 21–22.) In subsequent filings, Kidwell alternatively requests that Court remand "for a new hearing and decision." (*See* Doc. 14, p. 45.)

[17] The Commissioner's administrative discretion is limited in that the right to SSI Benefits "are clearly defined in the law." *See* 20 C.F.R. § 416.110(b).

42 U.S.C. § 405(g); *see Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (noting that 405(g) Review "is demarcated by a deferential reconsideration of the findings of fact and an exacting examination of the conclusions of law"). Courts should nonetheless reverse a final decision that is not: (1) based on correct legal standards; or (2) supported by "relevant evidence" that "a reasonable person would accept as adequate to support a conclusion" ("**Substantial Evidence**").[18] *See* 42 U.S.C. § 405(g); *Ellison*, 355 F.3d at 1275.

In determining whether Substantial Evidence exists, district courts must scrutinize the record as a whole, but they must not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [ALJ]." *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015); *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (requiring consideration of "favorable" and "unfavorable" evidence). Credibility determinations in particular "are the province of the ALJ," and must be accorded deference. *See Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780 (11th Cir. 2014). Further, as Judge Kelly correctly observed: "[w]eighing the opinions and findings of treating, examining, and non-examining physicians is integral" to an ALJ's disability determination, and 405(g) Review of such determinations "'involves some intricacy.'" (Doc. 18, p. 3 (quoting *Gaskin v. Comm'r of Soc. Sec.*, 533 F. App'x 929, 931 (11th Cir. 2013).)[19]

---

[18] Because Substantial Evidence is something less than a preponderance but more than a mere scintilla, the district court must affirm "even if the evidence preponderates against the Commissioner's findings." *See Martin*, 894 F.2d at 1529; *see also Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

[19] The Court will not restate the general legal principles on this matter. Instead, the Court adopts Judge Kelly's correct and succinct summary (Doc. 18, pp. 4–5), which drew

## I.     The Report

In accordance with 28 U.S.C. § 636(b)(1)(B), Judge Kelly issued his Report on February 2, 2018. (Doc. 18.) With citation to controlling law, the Report provides the following proposed findings and recommendations:

> (1)     ALJ Marcinkowski committed reversible error in his consideration of evidence from three medical sources—Dr. Kidd, treating physicians Annette Cabiac, M.D. ("**Dr. Cabiac**"), and examining psychologist Earl Teller, Ph.D. ("**Dr. Teller**");
>
> (2)     Because the Court must give substantial deference to an ALJ's credibility determinations—even if the evidence supports a contrary conclusion—the Court should find "no error" in ALJ Marcinkowski's consideration of the inconsistencies between certain medical records and [Kidwell's] testimony;"
>
> (3)     Notwithstanding ALJ Marcinkowski's finding that Kidwell had moderate difficulties with regard to concentration, persistence, and pace ("**CPP Limitations**"), he did not commit reversible error by failing to: (a) explicitly include such limitations in his RFC determination; and (b) omitting CPP from the hypothetical questions posed to VE Bouker; and
>
> (4)     the Court should reverse and remand the 2015 Decision for further proceedings pursuant to sentence four of § 405(g). (*See* Doc. 18 ("**Report**").)

(*See* Doc. 18.) The Commissioner filed objections. (Doc. 19.) Kidwell responded (Doc. 21), and filed partial objections (Doc. 22). The Commissioner did not respond to Kidwell's

---

no objections from the parties. (*See* Docs. 19–21.)

objections, and the deadline to do so has passed.

The Court may accept, reject, or modify the Report "in whole or in part." *See* Fed. R. Civ. P. 72(b)(3). Pursuant to 28 U.S.C. § 636(b)(1), the Court must "make a de novo determination of those portions" of the Report to which the parties have objected. *See* 28 U.S.C. §636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). On careful consideration, the Court rejects the parties' respective objections and finds that the Report is due to be adopted and affirmed.

The Commissioner's first objection concerns Judge Kelly's determinations that ALJ Marcinkowski erred in his treatment of the statements of Drs. Kidd and Cabiac ("**Family Doctors**"). (Doc. 19, pp. 1–2.) There is no dispute that the Family Doctors were Kidwell's treating physicians. As such, ALJ Marcinkowski was required to: (1) give substantial or considerable weight to their opinions; or (2) articulate good cause for failing to do so.[20] The Commissioner concedes that ALJ did neither:

> [T]he Report correctly notes that the ALJ did not thoroughly explain how the record failed to support the Family Doctors' opinions that Kidwell was limited in his ability to sit, stand, and walk.

(*Id*. at 2.) This concession that ALJ Marcinkowski did not comply with the Explicit Reasoning Requirement is fatal to the Commissioner's first objection.[21]

---

[20] Good cause exists when: (1) a treating source opinion was not bolstered by the evidence; (2) the "evidence supported a contrary finding;" or (3) the treating source opinion "was conclusory or inconsistent with the doctor's own records." *See Winschel*, 631 F.3d at 1178–79.

[21] With respect to the opinions of treating physicians, failure to comply with the Explicit Reasoning Requirement is cause for reversal and remand. *See Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982) (failing "to provide the reviewing court

Next, the Commissioner argues that the Court must reject the Report as to Dr. Kidd because Judge Kelly found no error in three of the five reasons that ALJ Marcinkowski did articulate. (*See id*. at 3.) Specifically, in a footnote, Judge Kelly wrote:

[6] The undersigned finds no error in the ALJ's second, third, and fourth reasons for giving little weight to Dr. Kidd's opinions. For his second reason, the ALJ applied the proper legal standards to the portion of Dr. Kidd's September 27, 2012 opinion which rendered Claimant disabled. *See Wilcox v. Comm'r, Soc. Sec. Admin*, 442 Fed. Appx. 438, 440 (11th Cir. 2011) ("a statement by a medical source that a claimant is "disabled" or "unable to work" is not binding on the ALJ"). For his third reason, the ALJ correctly noted that there was no objective medical determination on the basis for Claimant's seizures. R. 1535 (noting that the workup to Claimant's seizures was "inconclusive"). *See also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding that a treating physician's report "may be discounted when it is not accompanied by objective medical evidence …"). For his fourth reason, the ALJ properly gave little weight to the portions of Dr. Kidd's opinions regarding Claimant's upper left extremity and manipulative limitations because the ALJ cited to evidence contradicting those limitations at step two. R. 48. As noted above, an ALJ may give a treating physician's opinion less than substantial weight if it is contradicted by the medical record. *See supra* p. 4.

Plainly, the reasons discussed do not address all of Dr. Kidd's opinions; rather, they address one isolated statement on September 27, 2012, which touched on a matter within the province of the Commissioner, and two opinions concerning Kidwell's Wrist Injury and seizures.

The Commissioner simply ignores ALJ Marcinkowski's improper devaluation of Dr. Kidd's remaining opinions concerning, among other things, the severity of Kidwell's GI problems, migraines, and Mental Ailments. Because each of these opinions support the Disability Claim, ALJ Marcinkowski's failure to properly address them is reversible error. *See Kahle v. Comm'r of Soc. Sec.*, 845 F. Supp. 2d 1262, 1273 (M.D. Fla. 2012) (rejecting harmless error finding where acceptance of physician's improperly rejected opinion would "necessarily reduce Claimant's RFC"); *see also Powell v. Astrue*, 250 F. App'x 960,

with the sufficient basis to determine that the correct legal principles have been followed is grounds for reversal"); *see also Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986) (stating that the ALJ "must state specifically the weight accorded each item of evidence and the reasons for his decision").

964–65 (11th Cir. 2007) (discussing inadequately addressed limitations evidence and requiring re-assessment on remand).

The Commissioner's remaining objection concerns Judge Kelly's "assignments of error regarding [ALJ Marcinkowski's] evaluation of the opinions of Dr. Teller." (Doc. 18, p. 5.) The Commissioner contends that the Court should reject this assignment of error because the record evidence cited by ALJ Marcinkowski constitutes substantial evidence that Dr. Teller's opinions concerning the extent of Kidwell's deficits in memory, concentration, social interaction, and adaptation ("**Teller Opinions**") were inconsistent with "mental health treatment records" and not born out by the longitudinal record. The Court disagrees because the Teller Opinions would have been supported by the Family Doctor opinions—had they been properly considered.

Having rejected the Commissioner's objections, reversal and remand is required. Thus, the Court need not decide whether Judge Kelly erred in recommending that the Court reject Kidwell's arguments that ALJ Marcinkowski's committed additional error with respect to the CPP Limitations, Kidwell's credibility, and the opinions of other at least six other physicians. Nonetheless, in the remand proceedings, the Court notes that the Commissioner should reconsider the record in its entirety and fully comport with the Explicit Reasoning Requirement.

CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.       U.S. Magistrate Judge Kelly's Report and Recommendation (Doc. 18) is **ACCEPTED**.

2.    The final decision of the Commissioner of Social Security is **REVERSED** and the matter is **REMANDED** to the Commissioner of Social Security for further proceedings.

3.    The Clerk is **DIRECTED** to enter Judgment in favor of Kidwell and against Defendant Commissioner of Social Security and to **CLOSE** this case.

**DONE AND ORDERED** in Orlando, Florida, this 30th day of March, 2018.



ROY B. DALTON JR.
United States District Judge

Copies to:

Counsel of Record